Rhonda R. Trotter (State Bar No. 169241)
rhonda.trotter@kayescholer.com
Oscar Ramallo (State Bar No. 241487)
oscar.ramallo@kayescholer.com
KAYE SCHOLER LLP
1999 Avenue of the Stars, Suite 1600
Los Angeles, California  90067-6048
Telephone:  (310) 788-1000
Facsimile:   (310) 788-1200

*Attorneys for Plaintiff*
REIS ROBOTICS (CHINA) CO., LTD

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REIS ROBOTICS (CHINA) CO., LTD,<br><br>Plaintiffs,<br><br>v.<br><br>MIASOLÈ HI-TECH CORP. and MIASOLÈ INC.,<br><br>Defendants. | Case No.:   5:15-cv-6112<br><br>**COMPLAINT FOR BREACH OF CONTRACT AND JOINT ENTERPRISE LIABILITY** |

Plaintiff REIS Robotics (China) Co., Ltd. ("REIS Robotics") alleges the following against defendants MiaSolè Hi-Tech Corp. and MiaSolè Inc. (collectively, "Defendants"):

## PARTIES

1.　　Plaintiff REIS Robotics is, and at all times mentioned has been, a corporation governed under the laws of the People's Republic of China with its principal place of business in China.  REIS Robotics is a technology company which designs and executes complete automation systems.

2.　　REIS Robotics is informed and believes, and thereupon alleges, that defendant MiaSolè Hi-Tech Corp. ("MHT") is and at all times mentioned herein has been a California

corporation with its principal place of business at 2590 Walsh Avenue, Santa Clara, California 95051, United States of America.

3. REIS Robotics is informed and believes, and thereupon alleges, that defendant MiaSolè Inc. ("MiaSolé") is and at all times mentioned herein has been a California corporation with its principal place of business at 2590 Walsh Avenue, Santa Clara, California 95051, United States of America.

## JURISDICTION AND VENUE

4. This Court has original jurisdiction in this matter under 28 U.S.C. § 1332(a)(2) because the plaintiff is a citizen of a foreign state, the defendants are citizens of California, and the amount in controversy exceeds $75,000.

5. Venue is proper in the United States District Court of the Northern District of California under 28 U.S.C. § 1391 because both defendants reside in this district.

## INTRADISTRICT ASSIGNMENT

6. This action is appropriate for assigning in the San Jose Division because a substantial part of the events or omissions which give rise to the claim occurred in Santa Clara County.

## FACTUAL BACKGROUND

### The Master Agreement and Contract

7. MHT holds itself out as a manufacturer of flexible photovoltaic modules, commonly known as solar panels.

8. REIS Robotics is a leading technology company for robot and system integration. REIS Robotics manufactures and engineers assembly lines that its customers use to manufacture various products.

9. MHT sought out REIS Robotics to manufacture assembly lines that MHT claimed it would use to manufacture flexible photovoltaic modules.

10. Thus, on or about October 27, 2014, REIS Robotics and MHT entered into a signed Master Supply Agreement (the "Master Agreement"). Pursuant to the Master Agreement, MHT ordered two assembly line systems from REIS Robotics, Lines 1 and 2, to be designed for the

production of flexible photovoltaic modules. The Master Agreement provides that the total costs of the Products and Services shall be $21 million in addition to a one-time non-recurring engineering ("NRE") fee of $1.3 million.

11. Pursuant to the Master Agreement, on or about October 27, 2014, REIS Robotics and MHT entered into a Contract (the "Contract"), pursuant to which 30% of the $21 million contract price was due upon order of the two lines and 60% proportional of each line was due to REIS Robotics with "advice of readiness for delivery of each line." The Contract also provides that a Factory Acceptance Test (FAT) should take place immediately after a line is ready for operation and that, if the acceptance test is not performed for reasons REIS Robotics is not responsible for, acceptance is considered as given with the date of announced readiness for acceptance. The Contract also provides that MHT is obliged to accept the ordered goods at the agreed date of delivery and to meet the agreed payment obligations.

12. On or about November 3, 2014, REIS Robotics received payment of $7,600,360 million from MHT. Of that total, $6.3 million represented the 30% due upon order of the two lines, and $1.3 million represented the NRE fee. Thus, $13,399,640 of the total $21 million price for Products and Services remains unpaid.

13. On or about August 18, 2015, REIS Robotics advised MHT by email that Line 1 was ready for the Factory Acceptance Test in Germany beginning the week of Monday, August 24th.

14. On or about August 18, 2015, REIS Robotics provided invoices to MHT requesting the 60% payment for Lines 1 and 2.

15. On or about August 20, 2015, MHT employee Mark Ensor wrote to REIS Robotics via email stating that he fully understood why REIS Robotics "may choose to have the FAT next week. Unless, tomorrow, you choose to delay the FAT, please assume that I will travel to view the status of equipment as is."

16. Mr. Ensor subsequently flew to Germany and inspected the materials the following week, performing a technical review instead of a full FAT.

17. On or about September 24, 2015, REIS Robotics wrote to MHT again requesting payment, referred to the prior invoices, and stated that the lines were ready for delivery. The letter also asked MHT to arrange for FAT before September 30, 2015 or "otherwise it will be deemed that the FAT is successfully completed and we will start to disassemble and pack the goods."

18. On or about October 30, 2015, despite its clear contractual obligation to accept the goods, MHT still had not scheduled the FAT nor paid any of its invoices, and REIS Robotics wrote to MHT requesting further assurances pursuant to 6 Del. C § 2-206 that MHT would meet its contractual obligations with respect to both Lines 1 and 2. With respect to Line 1, further assurances in the form of a $6,873,120 payment were requested no later than November 16, 2015. With respect to Line 2, further assurances were requested in the form of a confirmation of the FAT location no later than November 16, 2015, and provision of a letter of credit guaranteeing payment no later than December 15, 2015. The letter warned that failure to provide adequate assurances may be treated by REIS Robotics as a repudiation of the Master Agreement by MHT.

19. On November 10, 2015, an MHT employee wrote to REIS Robotics in an email, "I have information that funding is scheduled to arrive this or the coming week. Our first priority will be to pay the arrears."

20. November 16, 2015 came and went. MHT did not provide any payment for Line 1. MHT did not confirm the FAT location for Line 2. MHT did not otherwise provide any adequate further assurances for either Line.

21. On November 19, 2015 counsel for REIS Robotics sent a letter to MHT further notifying it that MHT had failed to meet its contractual obligations regarding Lines 1 and 2. Counsel's letter demanded further assurances with regards to payment on Line 1 and confirming the location for the FAT for Line 2 by December 8, 2015 and reiterated the demand for a letter of credit by December 15, 2015 with respect to Line 2.

22. On December 1, 2015, MHT's in-house counsel emailed REIS Robotics' counsel "We have received your letter dated November 19. As of now, we have no payment commitment from our corporate office but we are doing everything in our power to obtain a commitment that

will allow us to resolve this difficult situation.  We will update you as we learn more and we hope that you can bear with us until we can reach a resolution."

23. December 8, 2015 came and went, and MHT did not provide any payment for Line 1.  December 15, 2015 came and went, and MHT did not provide a letter of credit with respect to Line 2.

24. By its actions, MHT has repudiated the Master Agreement and Contract.

**MHT and MiaSolè's Joint Enterprise**

25. MHT is an indirect wholly owned subsidiary of Hanergy Thin Film Power Group Ltd. ("HTF"), a publicly held company listed on Hong Kong's Stock Exchange.

26. HTF's ultimate corporate parent is Hanergy Holding Group Ltd. ("Holding").

27. On information and belief, MiaSolè is a subsidiary of Holding.

28. Holding was founded by Li Hejun in 1994 and is headquartered in Beijing, China.  It has been reported that at one point in time the "breakneck growth" of Holding made Li the richest man in China.

29. This breakneck growth was based on an elaborate façade in which the companies within Holding's corporate family entered into sham intra-family transactions for the purpose of artificially boosting the profits and value of Holding.  Rather than being engaged in legitimate business enterprises, each company within the Holding corporate family, including MiaSolè and MHT, were instrumentalities in a common venture to inflate the value of Holding and unjustly enrich its owners.

30. Indeed, at its peak, HTF reportedly had a market capitalization of $40 billion, more than six times higher than its largest global competitor and more than the rest of the Chinese solar sector combined, even though HTF focused on thin film technology, a niche type of solar panel that accounts for only about a tenth of the global market.

31. This façade came crumbling down on May 20, 2015, when the share price of HTF crashed by nearly 50%, wiping out over $19 billion of market value in approximately half an hour.

32. A January 28, 2015 Financial Times article entitled "Breakneck growth of Hanergy raises questions" presaged the fall of Hanergy and revealed the sham nature of the corporate group.

The article states "The Financial Times, in analysing recent financial statements of the company, has found some unconventional practices behind Hanergy Group's soaring fortunes. It has been racking up enviable revenues largely through sales between its listed subsidiary, HTF, and itself." The Financial Times continued that "[w]hile many of its rivals have struggled to remain profitable, HTF, which sells equipment used to make solar panels, has reported net profit margins of over 50 per cent."

33. The Financial Times stated that its review of relevant documents demonstrated that much of HTF's growth comes from within and that nearly all of HTF's HK$14.8bn in reported revenue since 2010 has been from sales of equipment to Holding, which controls 73 per cent of its shares. The Financial Times further noted that HTF's 2013 annual report showed that only 35 per cent of these contracts had been settled, with the balance held as receivables.

34. Thus, Holding delayed payment on its contracts, leaving its subsidiaries with large accounts receivable. This façade artificially boosted the value of Holding's interest in HTF until the dramatic crash in HTF's stock price on or about May 20, 2015.

35. HTF's Chief Executive, Frank Dai Mingfang, acknowledged the problem in a May 20, 2015 Financial Times article in which he was quoted as saying that "Our client at the moment is our main shareholder. That is the point that makes other people suspicious."

36. Illustrating the scale of Hanergy's artifice, The Financial Times quoted one analyst as stating "that were Hanergy Group producing at capacity – its panel output would 'roughly be sufficient to cover one of the smaller European states' yet 'nary a Hanergy panel has been seen in the wild.'"

37. MHT and MiaSolè are both integrally involved in this deceptive scheme.

38. On information and belief, MiaSolè was founded in 2001 as an independent startup company focused on the manufacture of copper indium gallium selenide (CIGS) thin-film photovoltaic solar panels. On January 9, 2013, Holding issued a press release that it had finalized its acquisition of a 100% stake in MiaSolè.

39. On information and belief, Holding intentionally undercapitalized MHT to allow it to continue MiaSolè's business while shielding MHT from the reach of any creditors.

40. For example, on September 18, 2013, Holding announced that all of MiaSolè's intellectual property rights in CIGS thin film solar technology had been transferred to three of its wholly-owned subsidiaries: Apollo Precision (Beijing) Limited, Apollo Precision (Fujian) Limited and Apollo Precision (Kunming) Yuanhong Limited. While the intellectual property was transferred to these three entities, MHT is held out as the owner of MiaSolè's technology to the public.

41. Similarly, Holding announced on March 17, 2014, that MiaSolè had assigned the lease to its operating premises to MHT for no consideration. Yet, a public records search revealed that MiaSolè is the record owner of millions of dollars of business equipment located on MHT's business address, while MHT apparently has no significant business equipment of its own. MiaSolè has no apparent separate business activities or employees from MHT to justify ownership of this business equipment.

42. MHT has also directly participated in the intra-family transactions of the kind described in The Financial Times reporting. For example, HTF's 2014 Interim Report discloses that MHT entered into an agreement, as buyer, with Hanergy (America) LLC, a subsidiary of Holding, as seller, for the acquisition of a module production line for a consideration of $15.2 million in cash. Similarly, Holding's 2014 annual report discloses that MHT bought $4 million of assets from Hanergy (America). Likewise, Holding's 2015 interim report discloses that MHT entered into a $HK 81 million sale of flexible photovoltaic modules and cells to certain unnamed subsidiaries of Holding.

43. Furthermore, in its dealings with REIS Robotics, MHT has repeatedly touted its connection to the Hanergy group of companies as an assurance of MHT's ability to fulfill its obligations under the Master Agreement and the Contract.

44. Under these circumstances the Court should ignore the fiction of any separation between MHT and MiaSolè. The Court should instead treat MHT and MiaSolè as a common instrumentality in the scheme to artificially inflate the value of Holding and hold MiaSolè equally liable to REIS Robotics for the debts of MHT.

## FIRST CAUSE OF ACTION

**(Breach of Contract – Against All Defendants)**

45. REIS Robotics re-alleges and incorporates herein by reference each and every preceding allegation as though fully set forth herein.

46. As described more fully above, REIS Robotics and Defendant MHT entered into a Contract and Master Agreement on or about October 27, 2014.

47. MHT breached the Contract and Master Agreement by, among other things, failing to pay the amounts due and owing to REIS Robotics.

48. REIS Robotics has demanded further assurances and payment of the amounts owed under the Master Agreement and Contract, but to date MHT has failed to offer further assurances and has refused to make payment as required by the terms of the Master Agreement and Contract, thus repudiating those instruments.

49. REIS Robotics has performed all obligations in accordance with the terms of the Master Agreement and Contract except those conditions or obligations it was prevented or excused from performing.

50. As a direct and proximate result of the Defendants' breach of the Master Agreement and Contract, REIS Robotics has been damaged in the amount of no less than the unpaid amounts due under the Master Agreement and the Contract.

## SECOND CAUSE OF ACTION

**(Joint Enterprise Liability – Against All Defendants)**

51. REIS Robotics re-alleges and incorporates herein by reference each and every preceding allegation as though fully set forth herein.

52. There is a unity of interest and ownership between MHT and MiaSolè.

53. Both MHT and MiaSolè are instrumentalities in a common venture whose purpose has been to artificially inflate the value of Holding, their common ultimate parent.

54. A great injustice would be forced upon REIS Robotics if the Court were not to recognize the legal fiction of corporate separateness.

## REQUEST FOR RELIEF

WHEREFORE, REIS Robotics respectfully requests that the Court enter judgment against defendants and each of them, as follows:

1. For compensatory damages of $13,399,640;
2. For prejudgment interest at the rate set by 6 Del. Code. Ann. § 2031(a);
3. For an order of Specific Performance requiring Defendants to perform their obligations under the Master Agreement and Contact;
4. For costs of suit and;
5. For such other and further relief as the Court may deem proper.

Date:   December 28, 2015

Respectfully submitted,

KAYE SCHOLER LLP

/s/ Oscar Ramallo

RHONDA TROTTER
OSCAR RAMALLO,
Attorneys for Plaintiff
REIS ROBOTICS (CHINA) CO., LTD