E-filed 3/31/2017

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REIS ROBOTICS (CHINA) CO., LTD., <br><br> Plaintiff, <br><br> v. <br><br> MIASOLE, INC., et al., <br><br> Defendants. | Case No.15-cv-06112-HRL <br><br> **ORDER GRANTING MOTION TO COMPEL ARBITRATION** <br><br> Re: Dkt. No. 14 |

Defendants Miasole Hi-Tech Corp. ("MHT") and Miasole, Inc. (together, "Defendants") move to compel arbitration on the basis of an arbitration clause contained in a purchase order. Plaintiff REIS Robotics ("REIS") argues that the purchase order, issued by MHT after the parties executed a Master Supply Agreement ("MSA"), is not part of the parties' agreement. All parties have consented to magistrate judge jurisdiction. Dkt. Nos. 7, 13. For the reasons described below, the court grants Defendants' motion to compel arbitration.

## BACKGROUND

REIS, a Chinese corporation that manufactures assembly lines, Dkt. No. 1, ¶ 1, sues Defendants for breach of contract and joint enterprise liability. Defendants are alleged to be California corporations. *Id.*, ¶¶ 2, 3. MHT, the party with which REIS contracted, reportedly breached its agreement with REIS by failing to pay the amounts owed for two assembly lines it ordered. *Id.*, ¶ 47. Plaintiff also asserts joint enterprise liability as to MHT and Miasolé, Inc., claiming that both companies were used in an allegedly fraudulent scheme to falsely inflate the value of their ultimate common parent, Hanergy Thin Film Power Group. *Id.*, ¶ 53.

The current dispute between the parties concerns three documents: the Master Supply Agreement ("MSA"), the contract (a document describing technical specifications), and the purchase order. The contract's terms are confidential, and neither party asserts that its terms are

relevant to the issues in this motion. *See* Dkt. No. 14, Withee Decl., ¶ 4.

MHT and REIS executed the MSA in October 2014. Withee Decl., Ex. 1; Emonts Decl., Ex. A. The MSA contains the following relevant terms:

> **2. Effect of this Agreement.** This Agreement shall exclusively govern the sale of all Products to MHT or its Affiliates by Supplier. Nothing herein will require MHT to purchase from Supplier a minimum quantity or restrict MHT from purchasing similar products from others.

Paragraph Three, Terms of Sale, contemplates that purchases would be initiated upon REIS's acceptance of a written purchase order from MHT (or MHT's affiliate):

> Products will be sold at the prices according to the Terms and Conditions of Sale set out in Schedule A, which incorporates Exhibit A. Each Product purchase by MHT from Supplier under this Agreement shall be initiated upon Supplier's written acceptance of a written purchase order issued by MHT or its Affiliate.

Schedule A and Exhibit A, along with three other schedules and associated exhibits, are described in Paragraph 1.3, which states that the exhibits and schedules "form part of this Agreement." Paragraph 1.3 also notes that exhibits and schedules "will be negotiated on a project-by-project basis."

Section 18, General Provisions, contains most of the provisions pertinent to the resolution of Defendants' motion. They are as follows:

> **18.1. Entire Agreement**. This Agreement, together with its Schedules and Exhibits, constitutes the complete agreement of the parties and supersedes any other agreements, written or oral concerning any purchase orders accepted after the Effective Date.[1]
>
> **18.2. Conflict**. In the event of any conflict between this Agreement and any purchase order, order confirmation or the like, this Agreement shall control, except as to such provisions in purchase orders and order confirmations relating to the price, payment terms, schedules, acceptance, and warranty, and any other provision that specifically states that such provision shall supersede the provisions of this Agreement. In the event of any conflict between this Agreement and any Schedules or Exhibits, unless otherwise clearly described, this Agreement shall control.
>
> **18.4. Amendments**. Any amendment to this Agreement or any Schedule

---

[1] The "Effective Date" refers to October 27, 2014, the day the parties entered into the MSA.

2

or Exhibit hereto shall be in writing and signed by authorized representatives of each party.

Additionally, the MSA provides that Delaware law applies and that the United Nations Convention for Contracts for the International Sale of Good and/or any local implementing legislation does *not* apply.  MSA ¶ 18.9.

On October 30, 2014 (three days after the MSA was signed), MHT issued a purchase order (in fact, the only purchase order it ever issued).  The pertinent terms are as follows:

> **1. ACCEPTANCE**.  This purchase order (the "Order") constitutes Buyer's offer to Seller.  Seller's written acknowledgment [sic] the Order, or the commencement of performance required by this Order, shall constitute acceptance of this Order and of all of the terms and conditions set forth herein (the "Terms") or made a part hereof.  No additional terms or modifications of the Terms shall be valid unless accepted in writing by Buyer.
>
> **23. ENTIRE AGREEMENT:** "This Agreement and the Attachments hereto constitute the entire agreement between Buyer and Seller concerning the subject matter hereof including all items identified on the face of this Order.  All prior agreements, discussions, representations, warranties, and covenants, or agreements, express or implied, between the parties except those expressly set forth in this agreement are superseded and cancelled by this Agreement.  Any amendments or modifications of this agreement shall be in writing and executed by the contracting parties."
>
> **24. ARBITRATION**:  Any controversy, claim, or action, whether in law or at equity, whether in tort, contract, warranty or otherwise, arising out of, relating to, or involving this Order and any agreement, undertaking, or performance that may be promised, performed, or executed to implement this Order will be settled by arbitration.  Any arbitration proceeding shall be conducted under the laws of the State of California and the Federal Arbitration Act, and pursuant to the Commercial Arbitration Rules of the American Arbitration Association insofar as such Commercial Arbitration Rules do not conflict with the provisions of this Section.  The site for any arbitration proceeding shall be San Jose, California.

The purchase order was initialed by a Photovoltaic Manager for REIS, YuSheng Zhao. REIS Managing Director, Dr. Manfred Emonts, avers that Zhao never had authority to agree to any modification of the MSA's business or legal terms; that Zhao had no role in negotiating the business or legal terms of the MSA; and that Zhao's role was limited to clarifying and discussing various technical issues associated with the manufacturing lines MHT purchased.  Pursuant to

1   REIS' policy, Emonts says that the purpose of Zhao's review of the purchase order was simply to
2   check that the technical and commercial data matched the underlying contract. Emonts Decl. ¶¶
3   17-18. Emonts further notes that the purchase order was signed by one Kevin Chang on behalf of
4   MHT. Emonts says that Chang had no leading role in the MSA negotiations. Emonts Decl. ¶ 19.
5        In the present motion, Defendants move to compel arbitration on the basis of the
6   arbitration provision contained in the purchase order. Defendants argue that (1) the MSA is not
7   the complete agreement of the parties, and that the purchase order became part of the parties'
8   agreement; (2) the arbitration provision was not precluded by the MSA because it did not conflict
9   with that document, which is silent with respect to dispute resolution; and (3) the arbitration
10  provision was an additional term, and, under UCC 2-207, it became part of the agreement because
11  (a) the New York rule[2] did not survive recent Supreme Court precedent, including *Concepcion*,
12  and (b) there is no surprise or hardship to REIS. In response, Plaintiffs argued that (1) the MSA
13  expressly states that it is the complete agreement of the parties (and it means what it says); (2)
14  UCC Section 2-207 does not apply, because the parties had already formed a complete agreement,
15  and so the subsequent purchase order was extraneous; and (3) even if 2-207 did apply, the
16  arbitration provision materially alters the contract because either (a) the New York rule survived
17  *Concepcion*, and defendants failed to prove that it is not the law in the relevant jurisdiction, or (b)
18  even absent the New York rule, the arbitration provision would cause surprise and hardship to
19  REIS.

## LEGAL STANDARD

21  Under the Federal Arbitration Act (FAA), "[a] party to a valid arbitration agreement may
22  'petition any United States district court for an order directing that such arbitration proceed in the
23  manner provided for in such agreement.'" *Lifescan, Inc. v. Premier Diabetic Servs., Inc.*, 363 F.3d
24  1010, 1012 (9th Cir. 2004) (quoting 9 U.S.C. § 4). When such a request is made, the court must

---

[2] The New York rule states that an arbitration provision, as a matter of law, always materially alters a contract pursuant to UCC Section 2-207. *Bergquist Co. v. Sunroc Corp.*, 777 F. Supp. 1236, 1244-46 (E.D. Pa. 1991) (discussing the New York rule); s*ee also Windsor Mills, Inc. v. Collins & Aikman Corp.*, 25 Cal. App. 3d 987, 995 (1972) ("it is clear that a provision for arbitration inserted in the acceptance or confirmation of an offer to purchase goods 'materially alters' the offer.").

determine (1) whether an arbitration agreement exists and (2) whether it encompasses the dispute at issue. *See id.* at 1012*; see also Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir.2000). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983).

"Arbitration is a matter of contract and the FAA requires court to honor parties' expectations." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 351 (2011). A court may compel the parties to arbitration only when the parties have agreed to arbitrate the dispute at issue. *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 302-03 (2010). Additionally, arbitration should be denied if the court finds "grounds as exist at law or in equity for the revocation of any contract," such as fraud, duress or unconscionability. 9 U.S.C. § 2; *Rent-A-Center, West, Inc. v. Jackson*, 130 S.Ct. 2772, 2776 (2010). The court applies ordinary state-law principles governing the formation of contracts to carry out this task. *Davis v. O'Melveny & Myers*, 485 F.3d 1066, 1072 (9th Cir.2007).

## DISCUSSION

There appears to be no dispute that the terms of the arbitration provision are broad enough to cover the present dispute. Thus, the court's only task is to determine whether the arbitration provision is part of the parties' agreement.

The MSA is not the complete and entire expression of the parties' agreement. It cannot be, according to its own terms. The MSA, in two ways, acknowledges that aspects of the agreement between the parties will be determined in the future, in additional documents. First, paragraph 1.3 describes exhibits and schedules that "form part of this Agreement" and "will be negotiated on a project-by-project basis." Second, paragraph 18.2 anticipates—and paragraph 3 essentially requires, in order for the MSA to have any real commercial effect—the issuance of purchase orders with additional terms, some of which may conflict with the terms of the MSA. Given that the MSA itself is not yet fully negotiated, and given that it requires additional documents for any transaction between the parties to occur, the court concludes that the MSA is not the complete agreement of the parties.

1    REIS argues that this conclusion requires the court to read paragraph 18.1 out of the MSA.
2    18.1 states: "This Agreement, together with its Schedules and Exhibits, constitutes the complete
3    agreement of the parties and supersedes any other agreements, written or oral, concerning any
4    purchase orders accepted after the Effective Date." Indeed, courts must interpret contracts "in a
5    way that gives effect to every term of the instrument, and that, if possible, reconciles all of the
6    provisions of the instrument when read as a whole." *Council of the Dorset Condo. Apartments v.*
7    *Gordon*, 801 A.2d 1, 7 (Del. 2002). Paragraph 18.1, however, is susceptible of two meanings: the
8    meaning that REIS proposes—that the MSA trumps all purchase orders submitted in the future—
9    and the meaning proposed by Defendants—that the MSA trumps only prior agreements made
10   regarding purchase orders. Though the Defendants place great weight on the retrospective
11   connotations of the word "supersedes" (and the court agrees that this word often has a backwards-
12   looking aspect), the more telling clue in the text is the word "concerning." "Concerning" suggests
13   that the MSA supersedes agreements made "about" or "with respect to" purchase orders accepted
14   after the effect date—that is, it supersedes other agreements dictating terms related to the effects of
15   such purchase orders. If the parties had wished the MSA to supersede *purchase orders*, they
16   should have said so directly.[3] They did not.

17   As REIS points out, the phrase "complete agreement" is a term of art, with REIS arguing
18   that it blocks out additional terms or modifications proposed after the agreement is signed. But the
19   cases REIS cites suggests that phrase's specific meaning and legal effect is not the one REIS
20   intends. In both *Dave Markley Ford, Inc. v. Lair* and *McGrew v. Vanguard Corp.*, the courts
21   determined that contracts that were the complete agreements of the parties precluded the
22   admission of parol evidence—that is, "evidence of *prior* agreements." *McGrew*, No. C.A. 5743,
23   1979 WL 4635, at *3 (Del. Ct. Chanc. Sept. 25, 1979) (emphasis added); *Lair*, 565 P.2d 671
24   (Okla. 1977). Paragraph 18.1 has this meaning—it blocks out prior agreements, not later ones.

25   The court thus concludes that the MSA is not the complete agreement of the parties, and
26   that paragraph 18.1 has the meaning suggested by defendants—it is a parol-evidence-type

---

[3] For example, "This Agreement . . . supersedes any other agreements, written or oral, *including* [or contained in] any purchase orders accepted after the Effective Date."

provision stating that the MSA supersedes any prior agreements made with respect to future purchase orders. But this conclusion does not address whether the arbitration provision became part of the parties' agreement. Two provisions of the MSA are relevant to this question, but neither ultimately provides an answer.

First, paragraph 18.2 states that, "[i]n the event of any conflict between this Agreement and any purchase order, order confirmation or the like, this Agreement shall control," with exceptions for several provisions not at issue here and "any other provision that specifically states that such provision shall supersede the provisions of this Agreement." The MSA is silent as to dispute resolution. Paragraph 18.2—governing conflicting terms—does not dictate whether or not the arbitration provision controls, because the arbitration provision does not conflict with any terms or provisions of the MSA.

Second, paragraph 18.4 states that, "[a]ny amendment to this Agreement or any Schedule or Exhibit hereto shall be in writing and signed by authorized representatives of each party." As an initial matter, the court observes that the purchase order was signed by representatives of each party, and the parties began performance after it was issued. REIS, however, argues that its signatory—YuSheng Zhao—was not authorized to amend the MSA. The court need not address this last argument, as it concludes, as a matter of law, that the arbitration provision was not an amendment to the MSA. Paragraph 18.4 refers specifically to "this Agreement"—with a capital "A"—and its schedules or exhibits. This indicates that the paragraph refers to amendments to the MSA document itself (for example, Paragraph 18.1 refers to the MSA as "[t]his Agreement" with a capital "A" and the "complete agreement of the parties"—meaning the sum-total of the parties' meeting of the minds—with a lower-case "a"). The arbitration provision in the purchase order is not an amendment to the (upper-case) Agreement, but a proposed additional term to the (lower-case) agreement between the parties. As such, paragraph 18.4 does not block the application of the arbitration provision.

Having concluded that the MSA does not keep out the arbitration provision, the question still remains whether the arbitration provision—a provision that does not conflict with or amend the MSA, but still proposes an additional term—is part of the contract. As the MSA is silent on

7

the matter of non-conflicting, non-amending additional terms, the court must turn to the default rules.

Defendants argue that UCC Section 2-207—adopted by Delaware in Del. Code Ann. Tit. 6, § 2-207—applies in cases, like this one, where multiple writings make up the contract and the court must determine which terms apply. REIS responds that Section 2-207 is limited to battle-of-the-forms situations, and that it does not apply when a party attempts to modify an agreement that has already been set. As the parties already completed contract formation through offer and acceptance of the MSA, REIS asserts, Section 2-207 should not apply.

As the court stated above, however, the MSA is not a complete agreement. In order to initiate a product purchase, the MSA requires REIS's written acceptance of a written purchase order from MHT. MSA ¶ 3. The MSA further provides that certain terms of these sales "will be negotiated on a project-by-project basis." MSA ¶ 1.3. These terms call for the sort of acceptances, confirmations, or memoranda discussed in the Official Comments to Section 2-207. The arbitration provision is thus a proposal for an added term in a writing that forms part of the parties' agreement, and Section 2-207 applies. Del. Code Ann. Tit. 6, § 2-207, Official Comment 2.

Section 2-207(2) states that additional terms will become part of a contract between merchants unless: "(a) the offer expressly limits acceptance to the terms of the offer; (b) [the additional terms] materially alter [the contract]; or (c) notification of objection to [the additional terms] has already been given or is given within a reasonable time after notice of them is received." Del. Code Ann. Tit. 6, § 2-207. The parties confine their arguments solely to the second of these conditions—whether the additional term materially alters the contract.

Plaintiff argues that the New York rule, which states that an arbitration provision *per se* materially alters a contract under Section 2-207, should apply.[4] Defendants, however, assert that

---

[4] Plaintiff specifically argues that Defendants failed to prove that Delaware law differs from California law, and that California follows the New York rule. In addition to the reasons the court will discuss above for declining to apply the New York rule, the court is also not persuaded that California courts would still follow that rule. *See Mitchell v. Am. Fair Credit Ass'n, Inc.*, 99 Cal. App. 4th 1345, 1355-57 (2002) ("In applying state law rules to determine if an agreement to arbitrate exists, we are mindful that, to the extent these rules single out arbitration agreements and

8

the New York rule is no longer valid in light of recent Supreme Court precedent.

Section 2 of the Federal Arbitration Act ("FAA") states that arbitration provisions in written contracts involving commerce "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.  This provision preempts state law rules that single out arbitration provisions and hold them unenforceable or invalid *because* they involve arbitration.  *Nelsen v. Legacy Partners Residential, Inc.*, 207 Cal. App. 4th 1115, 1136 (2012).  Arbitration clauses may be invalidated by generally applicable rules, but "not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011).  Defendants argue that the New York rule, by applying a *per se* determination specifically to arbitration provisions that does not apply generally, is preempted by the FAA.

REIS argues that Defendants have misinterpreted Supreme Court precedent.  In *Concepcion* and several other cases cited by Defendants, the Supreme Court held that the FAA preempted state law rules that prohibited "the arbitration of [ ] particular type[s] of claim[s]." *Id.*, *Nitro-Lift Techs., LLC v. Howard*, 133 S. Ct. 500 (2012); *Marmet Health Care Center, Inc. v. Brown*, 132 S. Ct. 1201 (2012).  REIS argues that these cases all involved state laws regarding the validity of arbitration provisions, not state laws concerning whether the parties agreed to arbitrate.  The New York rule survives, REIS asserts, because it concerns the latter question (specifically, whether an added arbitration provision becomes part of a contract), which is a matter determined by state law.

The FAA's pre-emptive reach, however, is broader than REIS claims.  The federal statute preempts not only state laws that prohibit arbitration of particular types of claims, but also state law rules that, while thought to be generally applicable, are "applied in a fashion that disfavors arbitration." *Concepcion*, 563 U.S. at 341.  Courts have found this second type of pre-emption at

---

impose special burdens on them, they interfere with the statutory goal of placing such agreements on an equal footing and are preempted;" citing cases in which courts have held state statutes preempted "that impose exceptional burdens to . . . proving the existence" of agreements to arbitrate.).

9

work even in analyses of whether there was an agreement to arbitrate. *Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional de Venezuela*, 991 F.2d 42, 46 (2d Cir. 1993); *see also Mitchell v. Am. Fair Credit Ass'n, Inc.*, 99 Cal. App. 4th 1345, 1355-57 (2002) ("In applying state law rules to determine if an agreement to arbitrate exists, we are mindful that, to the extent these rules single out arbitration agreements and impose special burdens on them, they interfere with the statutory goal of placing such agreements on an equal footing and are preempted."); *Erickson v. Aetna Health Plans of Cal., Inc.*, 71 Cal. App. 4th 646, 655 (1999). In *Progressive*, in just such an analysis of whether an agreement to arbitrate existed, the Second Circuit held that the FAA preempted the New York rule because it discriminated against arbitration provisions. 991 F.2d at 46.

The court finds the reasoning in *Progressive* persuasive. Because the New York rule discriminates against arbitration provisions by applying an otherwise generally applicable rule—Section 2-207(2)—in a manner that disfavors arbitration (by applying a *per se* rule rather than engaging in a case-by-case analysis of hardship and surprise), the court determines that the rule is pre-empted and does not apply here.

In place of the New York rule, the court engages in a case-by-case analysis under 2-207 of whether the proposed added provision materially alters the contract. Material alteration occurs when the added provision would "result in surprise or hardship if incorporated without express awareness by the other party[.]" Official Comment 4, UCC § 2-207. Surprise must be both objective and subjective. *Standard Bent Glass Corp. v. Glassrobots Oy*, 333 F.3d 440, 448 (3d Cir. 2003) (quoting *Aceros Prefabricados, S.A. v. TradeArbed*, 282 F.3d 92, 100 (2d Cir. 2002)) ("A profession of surprise and raised eyebrows are not enough. Instead, . . . the nonassenting party must establish that, under the circumstances, it cannot be presumed that a reasonable merchant would have consented to the additional term."). Hardship refers to whether the provision would impose "substantial economic hardship" on the other party. *El Paso Pipe & Supply Co.*, 978 F.2d 1185, 1191 (10th Cir. 1992).

Here, the court is not persuaded that the addition of the arbitration provision subjected REIS to either surprise or hardship. With respect to surprise, the MSA specifically stated that a

10

1   product purchase would be "initiated upon Supplier's written acceptance of a written purchase
2   order[,]" and that the terms related to purchases would be negotiated on a project-by-project basis.
3   The MSA further contains terms related to which provisions from purchase orders could enter the
4   parties' agreement. Additionally, the purchase order concerns products worth millions of dollars.
5   Under these circumstances, an objectively reasonable merchant would carefully review the entire
6   purchase order. In fact, an agent of REIS did review the purchase order, signing it and initialing it
7   on each page, including the page containing the arbitration agreement. Finally, REIS does not
8   argue that arbitration provisions are unusual in the industry. REIS cannot establish objective
9   surprise. *See Standard Bent Glass Corp.*, 333 F.3d at 448 n.12.

10  As for hardship, the arbitration provision states that arbitration would occur in San Jose,
11  the same city in which this litigation is occurring, so the change of location would not lead to
12  hardship for REIS. REIS specifically offers three claims of hardship. Two of the three are
13  unrelated to economic factors, but instead relate to features of arbitration (i.e., more limited
14  discovery and grounds for appeal). If the court were to hold that these features were hardships,
15  then all arbitration provisions would materially alter contracts under 2-207, and the court would be
16  back in the territory of the New York rule in discriminating against arbitration provisions because
17  they involve arbitration. The only claim of economic hardship REIS offers is the expense of three
18  arbitrators. But REIS does not offer any explanation regarding why or how the expense of three
19  arbitrators would be a hardship for it, a "leading technology company for robot and system
20  integration." Dkt. No. 1, ¶ 8. Additionally, arbitration is generally regarded as a less expensive
21  option than litigation. *Concepcion*, 563 U.S. at 345 (citing promoting arbitration as a more
22  efficient and less costly means of dispute resolution as a goal of the FAA); *see also Hawkins v.*
23  *Superior Court*, 89 Cal. App. 3d 413, 416 (1979) ("arbitration is less expensive and more
24  expeditious than litigation"). Finally, the court finds REIS's argument that the cost of three
25  arbitrators would constitute a hardship disingenuous in light of its request, in nearly the same
26  breath, for the more expansive (and expensive) discovery available in litigation.

27  The court thus concludes that REIS would suffer neither surprise nor hardship from the
28  inclusion of the arbitration provision. As a result, under 2-207, the arbitration provision did not

11

materially alter the contract and became one of its terms.

## CONCLUSION

As the parties had an agreement to arbitrate, and as REIS does not argue that the broad arbitration provision does not cover the present dispute, the court GRANTS the defendants' motion to compel arbitration and STAYS this litigation pending the completion of arbitration.  9 U.S.C. § 3.

**IT IS SO ORDERED.**

Dated: 3/31/2017

HOWARD R. LLOYD
United States Magistrate Judge